**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **BRUCE JOHN MICEK,** | : | |
| **Plaintiff,** | : | **Case No. 2:03-cv-1015** |
| **v.** | : | **Judge Holschuh** |
| **FLIGHTSAFETY INTERNATIONAL INC., et al.,** | : | **Magistrate Judge Kemp** |
| | : | |
| **Defendants.** | : | |
| | : | |

**MEMORANDUM OPINION & ORDER**

After being terminated from his job as a flight instructor, *pro se* Plaintiff Bruce Micek

filed suit against his former employer, FlightSafety International Inc. ("FlightSafety"), and two

related corporations, alleging age discrimination, breach of implied contract, promissory

estoppel, wrongful discharge in violation of public policy, retaliation, and negligent and

intentional infliction of emotional distress.  The Court's jurisdiction is based on diversity of

citizenship.  This matter is currently before the Court on FlightSafety's motion for summary

judgment.  (Record at 40).  For the reasons stated below, the Court grants FlightSafety's motion.

I.      **Background and Procedural History**

Defendant FlightSafety operates an international flight training school with 42 training

centers throughout the world, including one in Columbus, Ohio.  (Finck Aff. ¶ 4; Ex. A to Mot.

Summ. J.).  Its sister corporation, NetJets Aviation, Inc., sells fractional shares of jet aircraft to

individuals and businesses, and provides aircraft crews and maintenance services for the aircraft;

NetJets also offers on-demand air charter services.  At FlightSafety's Columbus Learning

Center, NetJets accounts for over 95% of FlightSafety's business.  (Id. at ¶ 8).  Both FlightSafety

and NetJets are subsidiaries of Berkshire Hathaway.

In November of 2000, Plaintiff Bruce Micek, age 58, was hired by FlightSafety to be a flight instructor at FlightSafety's Columbus, Ohio Learning Center.  (Id. at ¶ 9).  At the time, he and his wife, who suffers from multiple sclerosis, were living in Florida.  Plaintiff claims that Ted Finck, FlightSafety's Columbus Learning Center Manager, assured him that he and his wife would be provided with complete medical coverage, and that Plaintiff's job would be secure "as long as [he] could walk." (Pl. Dep. at 122).  Over the next few years at FlightSafety, Plaintiff received numerous promotions and excellent written performance evaluations.  (Exs. 1-1 through 1-9, 7-1 through 7-2, 8-1 to Pl. Aff. ).

The employment relationship began to sour in 2003.  In February of 2003, Plaintiff was promised a retroactive merit pay increase.  (Ex. 2-1 to Pl. Aff.; Finck Aff. ¶ 19).  However, before the paperwork could be processed, FlightSafety instituted a wage freeze and Plaintiff was not given his pay increase.  (Finck Aff. ¶ 20).  Plaintiff also alleges that, at some point, he approached Finck about unwanted romantic advances Finck had made toward another FlightSafety employee, and about public attacks Finck had made against two other FlightSafety employees.  Plaintiff contends that after this meeting, Finck began looking for a reason to terminate him.  (Pl. Aff. at 10-11).

In March of 2003, Plaintiff began training Michael Kidd, a NetJets pilot, for his initial type rating in the Cessna Citation X simulator.  (Finck Aff. at ¶ 30).   Plaintiff thought that Kidd displayed dangerous qualities and questionable judgment.  Plaintiff told his supervisor, Greg Desmond, and Bill Scharff, the Columbus Center Director of Training, of his concerns.  (Pl. Aff. at 16-17).  At the completion of the training period, Plaintiff determined that Kidd should not be

recommended for the FAA initial type rating checkride.  He notified Kidd and Richard Meickle, NetJets' Director of Training, of his decision.  Plaintiff claims that when he told Kidd that he was not recommending him for the checkride, Kidd became enraged, shouting at him and making a threatening move across the desk.  (Id.).  Later that day, Scharff and Desmond told Plaintiff that Finck was very unhappy about the Kidd incident.  Ultimately, Mark Payton, another FlightSafety instructor, provided Kidd with some additional training and agreed to license him.  (Finck Aff. at ¶ 33).

Thereafter, Plaintiff continued for several months to voice his safety concerns about Kidd to Desmond and Finck.  (Pl. Dep. at 187).  Although Desmond advised Plaintiff to "put it to bed," Plaintiff spoke to Meickle and to FAA liaison Tim Fleming about the matter.  (Compl. at ¶¶ at 39, 43-44).  This prompted Meickle to hold a meeting, in mid-June with Plaintiff, Scharff, Desmond, Payton, and Tom Gasper, Columbus Center Director of Standards.  (Pl. Dep. at 189-93).  The conflict was not resolved amicably.  On June 19, 2003, NetJets sent Finck a letter stating that based on the recent events, NetJets was prohibiting Micek from instructing any of its pilots.  (Finck Aff. ¶¶ 34-35).  Finck told Plaintiff that because NetJets accounted for nearly all of FlightSafety's business in Columbus, and NetJets would not permit Plaintiff to train its pilots, FlightSafety would have to terminate Plaintiff's employment effective June 30, 2003.  (Id. at ¶¶ 35-36, 40).  Although Finck attempted to find a position for Plaintiff at a different FlightSafety learning center, his efforts were unsuccessful.  (Id. at ¶¶ 37-38).

On November 3, 2003, Plaintiff filed suit against FlightSafety, NetJets, and Berkshire Hathaway, alleging seven causes of action: (1) age discrimination; (2) breach of implied contract; (3) promissory estoppel; (4) wrongful discharge in violation of public policy; (5)

3

retaliation; (6)  intentional infliction of emotional distress; and (7) negligent infliction of

emotional distress.  On May 12, 2004, the Court dismissed all claims against NetJets and

Berkshire Hathaway.  The Court also dismissed Plaintiff's claims of negligent and intentional

infliction of emotional distress.  FlightSafety has now moved for summary judgment on the

remaining claims.

## II.        Standard for Granting Summary Judgment

Although summary judgment should be cautiously invoked, it is an integral part of the

Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of

every action."  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . shall be rendered forthwith if the pleadings, depositions,
> answers to interrogatories, and admissions on file, together with the affidavits, if
> any, show that there is no genuine issue as to any material fact and that the
> moving party is entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a

matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains

for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury

if they really have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467

(1962) (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)).  See also

Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine

if there are genuine issues of fact to be tried.  Lashlee v. Sumner,  570 F.2d 107, 111 (6th Cir.

1978).  The court's duty is to determine only whether sufficient evidence has been presented to

make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the

4

credibility of witnesses, or determine the truth of the matter.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law.  Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003).  All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986);  Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001). Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson, 477 U.S. at 247-48 (emphasis in original).  A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties."  Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984).  See also Anderson, 477 U.S. at 248.  An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  See also Leary, 349 F.3d at 897.

5

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 322.  The nonmoving party must demonstrate that "there is a genuine issue for trial," and  "cannot rest on her pleadings."  Hall v. Tollett, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party.  Anderson, 477 U.S. at 252.  The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts."  Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993).  The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence.  Anderson, 477 U.S. at 251-52; Lansing Dairy, Inc., 39 F.3d at 1347.

### III.    Discussion

#### A.    Age Discrimination

Count I of Plaintiff's complaint alleges that FlightSafety discriminated against him on the basis of his age in violation of state law when it: (1) withheld his merit pay increase; and (2) discharged him and replaced him with a younger employee.  It is not clear whether Plaintiff's age discrimination claim is based on alleged violations of Ohio Revised Code § 4112.02 or

§ 4112.14.  In either case, the framework used to analyze the state law claims of age discrimination is the same framework used to analyze federal employment discrimination claims. See Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n, 66 Ohio St. 2d 192, 196, 421 N.E.2d 128, 131 (Ohio 1981).

In an employment discrimination case, a plaintiff can withstand a motion for summary judgment either by presenting direct evidence of discrimination or, using the McDonnell Douglas framework set forth below, by presenting circumstantial evidence from which a jury may infer a discriminatory motive underlying an adverse employment action. See Kline v. Tennessee Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997).  Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999).  A facially discriminatory employment policy or an express statement by a decision-maker of a desire to terminate employees because they belong to a protected class would constitute direct evidence of discrimination.  See Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000).

7

However, where the plaintiff has only circumstantial evidence of a discriminatory motive, claims are analyzed under the framework set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). Under that framework, a plaintiff must first establish a prima facie case of discrimination. In order to establish a prima facie case of age discrimination, a plaintiff must establish that: (1) he is a member of the protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) he was either replaced by someone substantially younger, or was treated less favorably than similarly-situated younger employees. See Weller v. Titanium Metals Corp., 102 Ohio St. 3d 8, 2004-Ohio-1775, 806 N.E.2d 154, at ¶ 1.

If the plaintiff is successful in establishing a prima facie case, an inference of discrimination arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802-03. If the employer articulates such a reason, the presumption of discrimination drops away, leaving only the issue of "discrimination *vel non*." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000). The plaintiff must then prove, by a preponderance of the evidence, that the reason offered was pretextual. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). The plaintiff may prove pretext by showing either that: (1) the proffered reason had no basis in fact; (2) the proffered reason did not actually motivate the discharge; or (3) the proffered reason was insufficient to motivate the discharge. See Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994); Peters v. Lincoln Elec. Co., 285 F.3d 456, 471-72 (6th Cir. 2002). The plaintiff has the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against him. Burdine, 450 U.S. at 253.

### 1. Merit Pay Increase

On February 17, 2003, Plaintiff was promised a retroactive merit pay increase.  (Ex. 2-1 to Pl. Aff.; Finck Aff. ¶ 19).  However, before the paperwork could be processed, FlightSafety instituted a wage freeze.  As a result, Plaintiff was not given his pay increase.  (Finck Aff. ¶ 20). Plaintiff has presented no direct evidence that FlightSafety refused to give him his merit pay increase because of his age.  Absent such direct evidence, Plaintiff must establish that: (1) he was a member of the protected class; (2) he suffered an adverse employment action; (3) he was qualified for the merit pay increase; and (4) he was treated less favorably than a similarly-situated younger employee.  Only the fourth element is in dispute.

Plaintiff contends that he was treated less favorably than a similarly-situated younger employee.  He claims that he and 42-year-old Michael Laine, another FlightSafety instructor, were both promised merit pay increases on the same day.  (Exs. 1-8, 1-9 to Pl. Aff.).  Laine received his merit pay increase, but Plaintiff did not.  In Burdine, the Supreme Court stated that, "[t]he burden of establishing a prima facie case of disparate treatment is not onerous."  450 U.S. at 253.  The Court finds that Plaintiff has established a prima facie case of age discrimination.[1]

The burden then shifts to FlightSafety to articulate a legitimate, non-discriminatory reason for the disparate treatment.  FlightSafety contends that it was unable to give Plaintiff his wage increase because a wage freeze went into effect on April 3, 2003, prior to the date Plaintiff's paperwork was processed.  In contrast, Laine's paperwork was processed on March 7,

---

[1] It does not matter that Laine is also within the protected class so long as he was substantially younger than Plaintiff.  See Coryell v. Bank One Trust Co., N.A., 101 Ohio St. 3d 175, 2004-Ohio-723, 803 N.E.2d 781, at ¶¶ 20-21.  The age difference between Laine and Plaintiff is approximately twenty years.

2003, prior to the date of the wage freeze.  FlightSafety notes that once the wage freeze went into effect, no flight instructor, regardless of age, received a wage increase.  (Finck Aff. ¶¶ 23-24).

The burden then shifts back to Plaintiff to prove that the reason given for the disparate treatment was pretextual.  FlightSafety notes that there were three flight instructors whose wage increases were put on hold because their paperwork was still pending when the wage freeze went into effect – Plaintiff, Robert Gatto, and David Rogers.  (Id. at ¶¶ 25-26).  Rogers was under the age of forty.  (Id. at ¶ 29).  FlightSafety also notes that six other flight instructors, who were recommended for wage increases during that same time period, received final approval prior to the wage freeze; they were all over the age of forty.  (Id. at ¶ 25).

Plaintiff claims that the only explanation he was given for not processing his paperwork prior to the wage freeze was that "it slipped through the cracks."  (Pl. Aff. p. 2).  Plaintiff admitted at his deposition, that he had no evidence that this explanation was false.  (Pl. Dep. at 207).  While the record does not indicate why Laine's paperwork was processed more quickly than Plaintiff's was, there is no evidence to support a finding that age was a factor, particularly in light of the evidence that many other flight instructors over the age of forty received their wage increases prior to the date of the wage freeze.

Based on the evidence presented, no reasonable jury could find that FlightSafety discriminated against Plaintiff on the basis of age when it failed to award him his wage increase prior to the date of the wage freeze.  FlightSafety is therefore entitled to summary judgment on this claim.

2.    **Termination**

Plaintiff has also alleged that FlightSafety discriminated against him on the basis of age when it terminated him and replaced him with a substantially younger employee.  Again, because Plaintiff has no direct evidence that his discharge was motivated, even in part, by age discrimination, he must establish a prima facie case of age discrimination by showing that: (1) he was a member of the protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by a substantially younger employee.  See Weller, at ¶ 1.

FlightSafety contends that Plaintiff cannot satisfy the fourth element.  It notes that, because of a hiring freeze, no flight instructors were hired at the Columbus Learning Center from December of 2002 until May of 2004, more than ten months after Plaintiff was terminated. (Booth Decl. ¶¶ 4-6; Ex. F to Mot. Summ. J.).  Once the hiring freeze was lifted, FlightSafety hired fifteen instructors within a period of 13 months.  Ten of those instructors were over the age of forty, and five of the ten were the same age or older than Plaintiff was when he was hired. (Id. at ¶¶ 7-8).

Plaintiff has offered absolutely no evidence in support of his claim that he was "replaced" by a substantially younger employee, and has not even identified which employee allegedly "replaced" him.  Because Plaintiff has failed to present sufficient evidence from which a reasonable jury could find that he was replaced by a substantially younger employee, he has failed to establish a prima facie case of age discrimination in connection with his termination. The Court therefore finds that FlightSafety is entitled to summary judgment on this claim.

11

**B.**      **Breach of Implied Contract**

In Ohio, there exists a strong presumption of employment-at-will.  "Unless otherwise agreed, either party to an oral employment-at-will agreement may terminate the employment relationship for any reason which is not contrary to law."  Mers  v. Dispatch Printing Co., 19 Ohio St. 3d 100, 103, 483 N.E.2d 150, 154 (Ohio 1985).  Ohio has recognized two exceptions to the employment-at-will doctrine: (1) an express or implied contract that alters the employee's at-will status; and (2) promissory estoppel.  See Wright v. Honda of Am. Mfg., Inc. (1995), 73 Ohio St. 3d 571, 574, 653 N.E.2d 381, 384 (Ohio 1995).[2]  These exceptions are generally invoked by employees claiming that certain agreements or representations altered their at-will status and precluded their employers from terminating them.  Plaintiff contends that both exceptions apply.  The Court will first address the breach of implied contract claim, and then the promissory estoppel claim.

Count II of Plaintiff's complaint alleges that FlightSafety breached an implied contract to employ him for an extended period of time.  Specifically, Plaintiff claims that, during the interviewing process, Ted Finck verbally assured him that Plaintiff's "job would be secure" and "that Plaintiff would be part of FlightSafety for life or 'as long as you can walk and breath [sic].'" (Compl. ¶ 19).  At issue is whether this statement was sufficient to alter Plaintiff's status as an "at-will" employee who was subject to discharge at any time.

"The general rule in Ohio is that unless otherwise agreed to by the parties, an employment agreement purporting to be permanent or for life, or for no fixed time period is

_____

[2]  A third exception, a tort for wrongful discharge in violation of public policy, will be discussed later in this opinion.

considered to be employment terminable at the will of either party." <u>Humphreys v. Bellaire</u> <u>Corp.</u>, 966 F.2d 1037, 1040 (6th Cir. 1992). In order to prevail on an implied contract claim, an at-will employee has the "heavy burden" of proving each element necessary to the formation of a contract. <u>See</u> <u>Penwell v. Amherst Hosp.</u>, 84 Ohio App. 3d 16, 21, 616 N.E.2d 254, 258 (Ohio Ct. App. 1992). A plaintiff must present evidence of an offer, acceptance, and consideration. <u>See</u> <u>Tersigni v. General Tire, Inc.</u>, 91 Ohio App. 3d 757, 760, 633 N.E.2d 1140, 1142 (Ohio Ct. App. 1993). There must be a "meeting of the minds" limiting the terms of discharge. <u>Schwartz v.</u> <u>Comcorp., Inc.</u>, 91 Ohio App. 3d 639, 647, 633 N.E.2d 551, 556 (Ohio Ct. App. 1993). As the Supreme Court of Ohio noted in <u>Wright</u>, the Court must look to all of the "facts and circumstances" surrounding the employment relationship to determine whether an implied agreement altered the employee's at-will status. This includes not only company policies and information contained in employee handbooks, but also oral representations made by supervisory personnel. <u>See</u> 73 Ohio St. 3d at 574-75, 653 N.E.2d at 384.

FlightSafety contends that Finck's assurances are insufficient to support a breach of implied contract claim, particularly in view of the fact that Plaintiff signed numerous documents acknowledging his understanding that he was an at-will employee, and that only the President of FlightSafety had the authority to alter that status. On October 10, 2000, Plaintiff signed an application for employment with FlightSafety. It read, in pertinent part:

> I understand that this application or subsequent employment does not create a contract of employment nor guarantee employment for any definite period of time. If employed, I understand that I have been hired at the will of the employer and my employment may be terminated at any time, with or without cause and with or without notice.

13

> Only the President has the authority to enter into any agreement of
> employment for any specified duration.  Such employment will
> only be valid and binding when the agreement is expressly set
> forth in written form and signed by the employee and the
> President.

(Ex. 6 to Pl. Dep.).

FlightSafety's written offer of employment, dated November 7, 2000, also stated that

"[t]he length of your employment is not guaranteed . . . FlightSafety is free to terminate you at

any time, with or without cause."  Plaintiff's acknowledgment of the offer, signed December 4,

2000, states that he understands that the employment relationship is at-will.  (Ex. 18-19 to Pl.

Dep.).  On November 30, 2000, Plaintiff signed documents acknowledging receipt of

FlightSafety's Business Conduct Guidelines and the Learning Center Operations Manual.

Again, the Operations Manual characterized the employment relationship as "at-will," and

stated, "[o]nly the President of FlightSafety has the authority to enter into any employment

agreement for a specified duration.  Such agreement is valid and binding only if it is expressly

set forth by the President."  (Exs. 39, 40A and 40B to Pl. Dep.).  Finally, on April 2, 2002,

Plaintiff acknowledged receipt of a written offer of a promotion, which again stated that he was

an at-will employee who could be terminated at any time, with or without cause.  (Ex. 41 to Pl.

Dep.).

Plaintiff does not deny that he signed statements acknowledging that only the President

of FlightSafety had the authority to alter his at-will status.  He nevertheless argues that he should

have been entitled to rely on Ted Finck's promise of job security.[3]  Finck allegedly promised him

---

[3] Plaintiff also argues that the at-will employment doctrine should not be used to protect
FlightSafety from liability for retaliatory discharge.  The Supreme Court noted in Mers that
unless otherwise agreed, at-will employees may be terminated at any time for any reason *not*

that he would have a job with FlightSafety for as long as he could walk and breathe.

In the Court's view, Finck's statement is insufficient, as a matter of law, to create an implied contract for lifetime employment. Courts have consistently held that similar statements are insufficient to alter an employee's at-will status. See Sagonowsky v. The Andersons, Inc., No. L-03-1168, 2005 WL 217023, at *11-12 (Ohio Ct. App. Jan. 28, 2005)(holding that supervisor's statement that "you won't get rich at The Andersons, but you'll always have a job," was insufficient to create an implied contract of lifetime employment); Daup v. Tower Cellular, Inc., 136 Ohio App. 3d 555, 562-63, 737 N.E.2d 128, 133-34 (Ohio Ct. App. 2000)(president's statement that employee was going to be his "right-hand guy for a long, long time" was insufficient to establish an implied contract of continued employment).

Furthermore, Plaintiff acknowledged, on numerous occasions, his understanding of his status as an at-will employee who could be terminated at any time, and his understanding of FlightSafety's policy that only the company's president could authorize an employment contract altering his at-will status. Several Ohio courts have held that promises of job security, made in the face of similar disclaimers, are insufficient to overcome the presumption of at-will employment. In Vickers v. Wren Industries, Inc., No. Civ.A. 20914, 2005 WL 1685101 (Ohio Ct. App. July 8, 2005), the court held that the statements "you don't ever have to worry . . . [a]s long as our doors are open, you've got a job," and "we would like for you to stay here and retire" were insufficient to constitute a claim for lifetime employment. The court further held that even

---

*contrary to law*. See 19 Ohio St. 3d at 103, 483 N.E.2d at 153. However, the issue of whether Plaintiff's termination was contrary to law, either because FlightSafety discriminated against him because of his age or retaliated against him because of his complaints about the licensing of Michael Kidd, is separate and distinct from the issue of whether Plaintiff's status as an at-will employee was altered because of an implied contract for lifetime employment.

if these statements were sufficient to support a finding of an implied contract, the fact that

plaintiff later signed a document acknowledging that he was an at-will employee relieved the

employer of any alleged prior oral promises.  Id. at *10.  See also Shepard v. Griffin Servs., Inc.,

No. 19032, 2002 WL 940110, at *13 (Ohio Ct. App. May 10, 2002)(oral promises "were

insufficient to overcome the at-will presumption, particularly in light of all of the disclaimers

located throughout the employee documents").

      Based on this case law, the Court concludes that there is no genuine issue of material fact

as to whether Finck's statement created an implied contract of continued employment.  The

Court finds that, under the circumstances presented here, his statement was insufficient as a

matter of law.  FlightSafety is therefore entitled to summary judgment on the breach of implied

contract claim.

      **C.**     **Promissory Estoppel**

      Plaintiff also seeks to recover, in Count III of his complaint, under a theory of promissory

estoppel.  As the court noted in Shaw v. J. Pollack & Co., 82 Ohio App. 3d 656, 661, 612 N.E.2d

1295, 1299 (Ohio Ct. App. 1992), the success of a claim for promissory estoppel is often

intricately tied to the success of a claim for breach of implied contract where they are based on

the same facts.

      The doctrine of promissory estoppel is available if there is a promise, "clear and

unambiguous" in its terms, reasonable and foreseeable reliance by the party to whom the promise

is made, and resulting injury.  See Cohen & Co. v. Messina, 24 Ohio App. 3d 22, 26, 492 N.E.2d

867, 872 (Ohio Ct. App. 1985).  However, "a promise of future benefits or opportunities without

a specific promise of continued employment does not support a promissory estoppel exception to

16

the well-established doctrine of employment -at-will." Wing v. Anchor Media, 59 Ohio St. 3d 108, 110-11, 570 N.E.2d 1095, 1099 (Ohio 1991).  In the absence of a specific promise, an employee is "hard pressed to demonstrate that he was justified in detrimentally relying on the employer's representations." Penwell, 84 Ohio App. 3d at 20, 616 N.E.2d at 257.  See also Condon v. Body, Vickers & Daniels, 99 Ohio App. 3d 12, 20-21, 649 N.E.2d 1259, 1264 (Ohio Ct. App. 1994).

In his complaint, Plaintiff alleges that FlightSafety should have expected that he would rely on Finck's promise of continued employment, and that he did, in fact, rely on that promise as evidenced by his purchase of a home near FlightSafety's Columbus Learning Center.  In its motion for summary judgment, FlightSafety argues that Plaintiff's claim fails because FlightSafety made no specific promises on which Plaintiff could rely.  FlightSafety again points to the many documents Plaintiff signed acknowledging the fact that he was an at-will employee. Plaintiff fails to address these arguments in his response brief.  In support of his claim, he simply details all of the economic and physical hardships his family has had to endure as a result of his termination.

As an initial matter, the Court notes that Plaintiff's promissory estoppel claim is not necessarily foreclosed by the fact that he signed documents acknowledging that he was an at-will employee who could be terminated at any time.  See Humphreys, 966 F.2d at 1042; Nott v. Woodstock Care Center, No. C-3-99-133, 2001 WL 1135057, at *12-13 (S.D. Ohio Mar. 21, 2001).  Nevertheless, because Plaintiff has failed to present sufficient evidence of a clear and unambiguous promise, an element on which he bears the burden of proof, FlightSafety is entitled to summary judgment on this claim of promissory estoppel.

17

In the Court's view, this case is similar to Snyder v. AG Trucking, Inc., 57 F.3d 484 (6th Cir. 1995).  In Snyder, the Sixth Circuit, interpreting Ohio law, held that the vice president's statement, that the plaintiff could expect to work at the company until plaintiff retired, was not sufficiently specific to change plaintiff's at-will status or to induce reliance on that promise.  Id. at 489.  The Court also found that plaintiff's claim of promissory estoppel was further weakened by the fact that plaintiff had acknowledged on his employment application that he had no right to continued employment.  Id.  Likewise, in Sagonowsky, the court of appeals held that the promise of job security made to the plaintiff -- that he'd "always have a job" -- was too vague and was insufficient to support a finding of a clear and unambiguous promise that altered his presumed at-will status.  See 2005 WL 217023 at *15.  Finck's promise, that Plaintiff would have a job at FlightSafety for as long as Plaintiff could walk and breathe, is indistinguishable from the promises at issue in Snyder and Sagonowsky.

Because the Court finds that Plaintiff has failed to present sufficient evidence of a clear and unambiguous promise that altered his status as an at-will employee, the Court need not address FlightSafety's alternative argument, that Plaintiff also failed to show that he relied on the promise to his detriment.

## D. Wrongful Discharge in Violation of Public Policy

In Count IV of his complaint, Plaintiff alleges that he was wrongfully discharged in violation of public policy for expressing concerns and lodging complaints about Kidd's qualifications, out of concern for public safety.[4]  In order to succeed on this claim, Plaintiff must

---

[4] Plaintiff's complaint also alleges that FlightSafety's refusal to give him his retroactive pay raise violated public policy as manifest in laws prohibiting discrimination on the basis of age.  He has cited to no authority recognizing a public policy claim outside of the context of a

establish:

> 1. That [a] clear public policy existed and was manifested in a state
> or federal constitution, statute or administrative regulation, or in
> the common law (the clarity element).
> 2. That dismissing employees under circumstances like those
> involved in the plaintiff's dismissal would jeopardize the public
> policy (the jeopardy element).
> 3. The plaintiff's dismissal was motivated by conduct related to the
> public policy (the causation element).
> 4. The employer lacked overriding legitimate business justification
> for the dismissal (the overriding justification element).

Collins v. Rizkana, 73 Ohio St.3d 65, 69-70, 652 N.E.2d 653, 657-58 (Ohio 1995) (internal

quotation marks and citations omitted).  FlightSafety does not dispute that clear public policy

exists in the form of whistleblowing statutes and case law.  Nor does FlightSafety dispute that

this public policy would be placed in jeopardy by dismissing employees in circumstances similar

to those claimed by Plaintiff.  However, FlightSafety argues that Plaintiff cannot establish the

third or fourth elements of his claim.

FlightSafety argues that Plaintiff was not terminated for complaining about

FlightSafety's licensing of Michael Kidd, but rather because NetJets prohibited Plaintiff from

training or testing any of its pilots.  While Plaintiff's ongoing complaints about public safety

issues may have triggered the chain of events that ended with Plaintiff's termination, the

undisputed fact is that Plaintiff was not terminated until after FlightSafety received NetJets'

---

wrongful discharge.  In any event, public policy claims fail, as a matter of law, where the
underlying statutory claim has failed.  See Godfredson v. Hess & Clark, Inc., 173 F.3d 365, 375
(6th Cir.1999)(applying Ohio law); Parry v. Mohawk Motors of Michigan, Inc., 236 F.3d 299,
312 (6th Cir. 2000)(applying Ohio law).  Because the Court has granted FlightSafety's motion
for summary judgment with respect to Plaintiff's age discrimination claims, summary judgment
is also warranted on Plaintiff's related public policy claim.

letter prohibiting Plaintiff from training or testing any more of NetJets' pilots.  In short, it is beyond dispute that the motivating cause of Plaintiff's dismissal was the receipt of that letter, not Plaintiff's expressed concerns for the safety of the public.

Moreover, based on the evidence presented, no reasonable jury could find that FlightSafety lacked an overriding legitimate business justification for dismissing Plaintiff.  As discussed earlier, NetJets accounted for more than 95% of FlightSafety's business at the Columbus Learning Center.  (Finck Aff. ¶¶ 8, 36).  Therefore, when NetJets prohibited Plaintiff from working with its pilots, FlightSafety simply could not justify Plaintiff's continued employment.  Plaintiff suggests that FlightSafety could have made arrangements for him to train and test the other 5% of FlightSafety's clients; however, as FlightSafety notes, there was no guarantee that there would be a steady stream of work involving non-NetJets clients.  Finck stated that he attempted to find an open position for Plaintiff at one of FlightSafety's other learning centers, but was unsuccessful.  (Id. at ¶ 38).  FlightSafety, therefore, had no choice but to terminate him.  (Id. at ¶¶ 39-40).

Because Plaintiff has failed to present any evidence from which a reasonable jury could find that Plaintiff's termination was not caused by NetJets' letter, nor could a reasonable jury find that FlightSafety lacked an overriding legitimate business justification for terminating him, the Court grants FlightSafety's motion for summary judgment on the public policy claim.

### E.     Retaliation

In Count V of the complaint, Plaintiff alleges that FlightSafety retaliated against him by terminating him "because of his complaints of unsafe licensing practices."  (Compl. ¶ 86).  Because Plaintiff cites to no statute as the basis for this claim, the Court construes it as a

20

common law claim of retaliatory discharge, and agrees with FlightSafety that it is duplicative of the public policy claim, and must be dismissed for the same reasons set forth above.[5]

**IV.     Conclusion**

For the reasons discussed above, the Court **GRANTS** FlightSafety's motion for summary judgment on Plaintiff's claims of age discrimination, breach of implied contract, promissory estoppel, wrongful discharge in violation of public policy, and retaliation.  (Record at 40).  The Clerk is directed to enter judgment in favor of Defendant FlightSafety and terminate this case.

**IT IS SO ORDERED.**


Date: January 4, 2006                                   **/s/ John D. Holschuh**
                                                        John D. Holschuh, Judge
                                                        United States District Court

---

[5]  Plaintiff's memorandum in opposition implies that his complaints about Finck's treatment of other employees might serve as an additional basis for his retaliation claim. However, because the retaliation claim, as set forth in the complaint, is clearly based solely on his complaints about unsafe licensing practices, the Court need not address this alternative theory.